UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

LISA A. HONEY,                  :        No. 3:23-CV-1382
                               :
        Plaintiff              :        (Caraballo, M.J.)
                               :
    v.                         :
                               :
FRANK BISIGNANO,[1]            :
Commissioner of Social        :
Security,                      :
                               :
        Defendant             :

## MEMORANDUM

## I.  Introduction

Plaintiff Lisa A. Honey seeks judicial review of the final decision

of the Commissioner of Social Security (the "Commissioner") denying

her application for disability benefits under Title II of the Social

Security Act. The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

This matter comes before the Court on Honey's claims that the

Administrative Law Judge ("ALJ") erred when she: (1) failed to perform

an adequate function-by-function analysis and evaluation of the medical

opinion evidence in determining Honey's residual functional capacity;

---

[1] Frank Bisignano was confirmed as the Commissioner of the Social Security
Administration on May 6, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil
Procedure and 42 U.S.C. § 405(g), Frank Bisignano is substituted for Kilolo Kijakazi
as the defendant in this suit.

(2) omitted a sitting, standing, or walking limitation from Honey's residual functional capacity, despite relying on two physicians' opinions containing such limitations; and (3) deemed unpersuasive the medical opinion of a treating physician that Honey was limited to sedentary work or less. Doc. 13 at 5–17. The matter is fully briefed and ripe for decision.

As explained below, the ALJ's conclusions when addressing all three challenged issues were supported by substantial evidence in the record, coupled with sufficient reasoning to permit meaningful judicial review. Accordingly, the Court will affirm the Commissioner's decision to deny Honey's claim for social security disability benefits.

## II.    **Background**

On December 16, 2020, Honey applied for Title II social security disability benefits, alleging complete disability from a myriad of impairments, including padendul neuralgia, anal spasms, pelvic nerve pain, myalgia of the pelvic floor, pelvic pain, and dyspareunia female. Doc. 9 at 16, 123 (hereinafter referred to as "Tr."). The Social Security Administration initially denied Honey's application in March 2021, and

upon reconsideration in June 2021. Tr. 123, 131. Honey thereafter requested a hearing before an ALJ. *Id.* at 141.

On December 9, 2021, ALJ Michelle Wolfe presided over Honey's hearing. The hearing concerned whether Honey was disabled within the meaning of the Social Security Act since January 9, 2020. *Id.* at 1212–14. At the hearing, ALJ Wolfe received various evidence of record, including clinical records, medical history, medical expert reports, vocational expert testimony, and Honey's own testimony. *Id.* at 1213–27. On January 6, 2022, ALJ Wolfe issued a decision concluding that Honey was not disabled. Tr. 13–28. ALJ Wolfe reached that conclusion by employing the five-step analytical process required under the Social Security Act to evaluate disability insurance and supplement security income claims. *See* 20 C.F.R. § 404.1520(a)(4).

The process requires sequential consideration of: (1) whether the claimant is engaged in substantial gainful work activity; (2) the medical severity of the claimant's impairments; (3) whether the impairment meets or equals a defined list of impairments; (4) a comparison between the claimant's past relevant work and residual functional capacity, *i.e.*, the most work that a claimant can perform despite his or her

3

limitations on a regular and continuing basis, *see* 20 C.F.R. § 404.1545(a); and (5) an assessment of the claimant's residual functional capacity and his or her age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(i)–(v). Should a claimant proceed past the first three steps of the analysis, the Commissioner will not find the claimant disabled when he or she can perform past relevant work, or adjust to other work, under the third and fourth steps, respectively. *Id.* at § 404.1520(a)(4)(iv)–(v), (f), (g).

Applying that analysis, ALJ Wolfe first determined that Honey met the insurance requirements of the Social Security Act, *see* 20 C.F.R. § 404.130, through December 31, 2023. Tr. 18. ALJ Wolfe also found that Honey had not engaged in substantial gainful activity between her alleged disability onset date of January 9, 2020, through the date of the decision. *Id.*

At the second step of the analysis, ALJ Wolfe found that Honey suffered from two severe impairments: pudendal neuralgia and myofascial pain dysfunction syndrome. *Id.* ALJ Wolfe also identified several non-severe impairments, including multinodular goiter; status post hiatal hernia repair; gastroesophageal reflux disease; dysphagia;

4

esophageal obstruction; dysphonia; deviated septum; dermatitis; insomnia; hypertension; sinusitis; viral infection; osteopenia; vitamin D deficiency; folliculitis; and major depressive disorder. *Id.* at 18–19. She found that these maladies caused "no more than 'mild' limitation in any of the functional areas" and that the evidence did not "otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities." *Id.* at 20.

Moving to the third step of the analysis, ALJ Wolfe determined that Honey's severe impairments failed to meet or medically equal one of the impairments listed in the Social Security Administration's regulations. *Id.* at 21. Honey thus did not automatically qualify as disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii) ("If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.").

Accordingly, ALJ Wolfe proceeded to determine Honey's residual functional capacity, before addressing the final two steps in the sequential analysis. Based on the medical evidence of record, ALJ Wolfe concluded that Honey could perform light work:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following limitations: She is limited to occasional balancing, stooping, crouching, crawling, kneeling, and climbing, but never climb on ladders ropes or scaffolds, or push or pull with the lower extremities including foot controls. Further, she is limited to occasional exposure to vibrations and hazards, including moving machinery and unprotected heights. Lastly, she requires a sit/stand option with each interval up to 1/2 hour, but she is not off task while transferring.

Tr. 21–22.

In reaching that conclusion, ALJ Wolfe analyzed three factors germane to this opinion. First, ALJ Wolfe considered Honey's testimony regarding her impairment symptoms:

> The claimant testified that she is unable to work due to a severe pelvic condition that limits her mobility, and it affects her mental state as she is depressed because of what she is unable to do, and her pain. She also said that it is hard for her to focus and concentrate, and that her medications make her mind foggy, and she has word finding difficulty. In addition, she said that she is generally homebound, as it is difficult for her to drive or be in a car, as being in a seated position puts a lot of stress on her pelvic muscles and nerves. Further, she said due to the pelvic issues now her sacroiliac joint is affected as is the bone density in her hips and pelvis. Moreover, the claimant testified that her medical appointments would interfere with her ability to work. She said that she sees her primary care physician once every three months and goes for internal therapy three to four times a month. Additionally, she said that approximately every three months, she goes for CT guided injections under anesthesia for which she is admitted to the hospital, and following the same, that she has a recovery/downtime of 2-4 weeks where she is unable to do

6

any activity other than self-care, as she said that normal activity including walking, increases her risk for falling. The claimant also said that she is limited to sitting 20 minutes at one time, and that when she goes from a seated to standing position, that it is very painful and she uses her lift chair. Lastly, she said that she spends more than half of her day lying down (Hearing Record). Overall, the claimant alleges she has been unable to sustain any type of full time work due to her combination of impairments and alleged level of symptomatology

*Id.* at 22–23.

In reviewing that testimony, in comparison to the record, ALJ Wolfe concluded "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." *Id.* at 23. The ALJ found, however, that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." *Id.*

Second, ALJ Wolfe conducted a detailed review of the clinical evidence concerning Honey's impairments and compared it to her alleged symptoms, to explain their inconsistencies:

[T]he record reflects that the claimant treated for pudendal neuralgia and myofascial pain dysfunction syndrome (Exhibits B3F/11, 24). While these impairments cause some continued functional limitations, they do not support greater limitations than those set forth in the above finding.

7

To illustrate, since the alleged onset date, the claimant reports constant pain, to the left mons and vulvovaginal area, that radiates to the left flank and leg at times but is also on the right side and in the sacroiliac region, which is better with rest and lying down, and exacerbated with sitting and activity (Exhibits B3F/7-8, 25-26, 35-36, 52, 58-59, B12F/9, B13F/1). Notably, these complaints have been the same since before the alleged onset date to the present. What is noted to change is the reports regarding her pain relief following the CT guided injections. Specifically, in January of 2020, the record reflects that the claimant obtains 3-4 months of reasonable relief following the injections. That said, in April of 2020, she did report some worsening of her pain. Of note, when the claimant reported worsening pain in April, she also had reported that she was trying to care for her grandchildren in December of 2019, January of 2020, and May of 2020. Thereafter, she reported that the injections were helping to address her pain, in May, August, and November of 2020 (Exhibits B3F/8, 18, 26, 34, 36, 46, 50, 61, 63, 69, B4F/52, 58, B12F/22-23). And while the claimant testified that she is limited in the amount of activity she could engage in for 2-4 weeks following her injections, there is no indication of any such limitation being imposed by any of her providers (Hearing Record). What is reflected in the record is her self-report to her physical therapist that she is sore for the first two weeks following her injections. Additionally, while the claimant stated that she has fallen following receipt of the injections, the only reference to her falling is in December of 2019, which is prior to the alleged onset date, and in September of 2021, when she told her physical therapist that she fell while walking in her yard, and that the same thing had happened to her a year prior (Exhibits B3F/66-67, B17F/11). Moreover, there is no indication in the record that the claimant's gait was antalgic, or that she had any lower extremity weakness. In fact the only reference to her difficulty walking was a subjective report she gave to the physical therapist in October of 2021 (Exhibit B17F/13). Furthermore, the claimant consistently reports

that her bladder and bowel symptoms are stable (Exhibits B3F/8, 26, 36, 43, 52, 59, B12F/9, B13F/1). Lastly, while the claimant testified to an inability to sit for more than 20 minutes, she told her physical therapist in May of 2021 that her pain was exacerbated within one hour of driving, and in April of 2021, she reported that she was going to Ocean City Maryland in May (Exhibits B17F/1, 5).

. . . .

Taking the foregoing into consideration, a review of the record as a whole does not support greater limitations. Overall, the longitudinal evidence of record does not support the claimant's allegations concerning the intensity, persistence, and limiting effects of her symptoms. Notably, in terms of her daily activities, she is able to perform a wide array of activities despite her impairments. To demonstrate, she is generally independent in her activities of daily living. Also, she is able to prepare simple meals, do some light housework, is able to drive when needed, go online, watch television, socialize with family and friends, attend church, and for a while during the relevant time she was able to care for her grandchildren (Exhibits B3E, B3F/46, 61, B8F, B9F). While the undersigned acknowledges that the claimant has some limitations performing these activities, and while none of these activities is dispositive, taken together and considered in conjunction with the above medical evidence of record, they suggest that the claimant can perform work within the above parameters on a sustained and continuous basis.

Moreover, while the claimant testified to her treatment interfering with her ability to work, aside from her receiving injections every three to four months, the records do not correlate with the amount of treatment she outlined. Notably, her physical therapy appears to be sporadic rather than consistently 3-4 times a month as she indicates. Also, as discussed above, there is nothing in the record which reflects

9

> that the claimant is unable to work for 2-4 weeks following each injection.
>
> That said, giving the claimant every benefit of the doubt as supported by the record with respect to her physical impairments, the residual functional capacity above accommodates the claimant's severe impairments by limiting her to light work. The residual functional capacity further adds a sit/stand option, as well as postural, environmental, and push/pull lower extremity limitations to guard against exacerbations, and for her comfort. Furthermore, the above limitations accommodate the side effects claimant testified to having from her medication. The result is that the record as a whole does not support any greater limitations than those outlined above.

*Id.* at 23–24.

Third, ALJ Wolfe evaluated the persuasiveness of various medical opinions in determining the limitations imposed by Honey's physical impairments. Of relevance to this report and recommendation, the ALJ specifically considered:

> [T]he state agency physical assessments of Dr. Charles Michael Manganiello and Dr. Catherine S. Smith and found them persuasive (Exhibits B2A, B4A). The doctors indicate the claimant is limited to light work, with the ability to occasionally, climb ramps and stairs, balance, stoop, kneel, crouch and crawl, but may never climb ladders, ropes, or scaffolds. In general, the doctor's opinions are consistent with, and supported by the longitudinal record. Specifically, there is nothing in the record to reflect that the claimant would be unable to lift and carry in the light exertional category, as she does not have any sensory or strength deficits and does not use any assistive devices to ambulate. Moreover, as the

claimant testified that sitting is the most painful position, a limitation to sedentary work would result in an exacerbation of her pain. Furthermore, while the claimant testified that she lies down half of the day, there is nothing in the record to support this allegation. Additionally, there is nothing in the record supporting that the claimant is limited physically for 2-4 weeks following receipt of the CT guided injections. Lastly, when the undersigned considers the claimant's testimony and the longitudinal record, all benefit was given to the claimant and additional limitations, such as the sit/stand option, the lower extremity push/pull limitation and the environmental limitations were added.

The opinion of Dr. Ziba Monfared was considered by the undersigned and is not persuasive (Exhibit B9F). Dr. Monfared indicates that the claimant could lift 21 to 50 pounds occasionally, sit 8 hours, stand 7 hours in 4-hour increments, and walk for 7 hours in 4-hour increments. She also indicates that the claimant could frequently use her bilateral feet to operate foot controls. Additionally, she notes that the claimant could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl, but may never climb ladders, scaffolds, or balance. Environmentally, she limits the claimant to loud heavy traffic, and occasionally exposure to unprotected heights, extreme cold and vibrations. The doctor's opinion is not consistent with or supported by the longitudinal record. Specifically, the doctor's opinion that the claimant can lift and carry in the medium exertional category, is an overestimate of her capabilities. Notably, when the claimant's treatment record of consistent CT injections every three to four months is considered, as well as her repeated complaints of pain, the undersigned finds that the record supports limiting the claimant to light work so as to avoid any exacerbation and aggravation of claimant's pain. Moreover, the light limitation is supported as the claimant has no sensory or strength deficits and does not use any assistive devices to ambulate. Furthermore, as the claimant testified that sitting is the most painful position, an indication that the

claimant is capable of sitting for 8 hours would result in an exacerbation of her pain. Lastly, there is nothing in the record to support limiting the claimant's exposure to noise.

The undersigned considered the opinion of Dr. Joseph E. Patruno from November 2020 and did not find it persuasive (Exhibit B2F). Dr. Patruno indicates the claimant can lift and carry less than 10 pounds frequently, 10 pounds occasionally, and 20 pounds rarely. Further, he indicates the claimant can sit, stand, and walk for less than 2 hours during an 8-hour workday, and that she may sit in 10-minute increments and stand in 20-minute increments. He also indicates she requires a job that allows her to alternate positions between sitting, standing, and walking, and that she will require 2-3 unscheduled breaks during the workday to lie down. Also, he indicates the claimant can rarely twist, stoop, bend, crouch, squat, climb stairs and ladders, but that she may frequently look down, turn her head right or left, look up and hold her head in a static position. Furthermore, he indicates the claimant will be off task 10 percent of the workday, is capable of moderate stress, and that she will have good days and bad days, but he was uncertain how often they would result in her being absent from work during a month. Finally, he states the claimant is unable to work full time (8 hours a day, 5 days a week) in any capacity. The doctor's opinion is not consistent with or supported by the longitudinal record. First, a statement by a medical source that a claimant is "disabled" is an issue reserved to the Commissioner (20 CFR 404.1527(d)). Second, when the claimant's testimony is considered, which indicates that sitting aggravates her pain, a limitation to sedentary would aggravate her condition. As such, the undersigned find that the record supports limiting the claimant to light work with a sit/stand option is instead supported. Moreover, the light limitation is supported as the claimant has no sensory or strength deficits and does not use any assistive devices to ambulate. And while the doctor indicates that the claimant may need to lie down during the day, there is nothing in the record to support this limitation.

Furthermore, there is nothing in the record supporting that the claimant is limited physically for 2-4 weeks following receipt of the CT guided injections. Lastly, when the claimant's activities are considered, such as her ability to prepare simple meals, do some light housework, to drive as needed, and her ability to go online, the same does not support a finding that the claimant would be off task 10 percent of the workday.

In sum, the above residual functional capacity assessment is supported by the record as a whole, including the claimant's treatment notes, the findings of the state agency assessments, and the reliable portions of the claimant's statements. Overall, the objective evidence does not support the alleged intensity and persistence of symptoms. Therefore, the undersigned finds that the claimant is capable of performing work in accordance with the residual functional capacity described above.

*Id.* at 25–26.

Having determined Honey's residual functional capacity to perform light work subject to limitations, and rejected several grounds for further limitation, ALJ Wolfe proceeded to the fourth step of the analysis to determine whether Honey was disabled within the meaning of the Social Security Act. Here, with assistance from a vocational expert's testimony, ALJ Wolfe compared Honey's past relevant work and residual functional capacity, finding that Honey was unable to perform her prior employment as a teacher's aide and eligibility specialist. *Id.* at 26.

Finally, in the fifth step of the sequential analysis process, ALJ Wolfe considered Honey's age, education, work experience, and residual functional capacity to perform light work, concluding that "there are jobs that exist in significant numbers in the national economy that the claimant can perform[.]" *Id.* at 27. Here, ALJ Wolfe again leveraged testimony from a vocational expert, reaching the specific conclusion that an individual fitting Honey's parameters could perform the occupational requirements of a cashier, small products assembler, or conveyor line bakery worker. Tr. 27.

As a result of this analysis, ALJ Wolfe determined that Honey was not disabled and denied her application for disability benefits. *Id.* at 28. Honey unsuccessfully appealed the decision to the Social Security Administration's Appeals Council, which denied Honey's request to review ALJ Wolfe's decision on June 26, 2023. *Id.* at 1. Having exhausted her administrative remedies, Honey's instant appeal to the district court followed.

Honey initiated this action with the Court on August 19, 2023. Doc. 1. The Commissioner filed an answer denying Honey's claim of error and provided the requisite transcripts from the disability

14

proceedings on October 26, 2023, and December 20, 2023. Docs. 9, 12.
The parties then filed their respective briefs, Docs. 13, 17–18, with
Honey alleging three errors warranting reversal or remand, Doc. 13 at
5–17.

Specifically, Honey alleges that ALJ Wolfe: (1) failed to undertake
an adequate "function-by-function assessment[] and evaluation of the
medical opinion evidence" to facilitate meaningful judicial review; (2)
erred when she found Honey "capable of sitting, standing, and walking
without limitation" "[d]espite finding the state agency medical
consultants' opinions" persuasive "and purporting to adopt the
limitations therein," and (3) erred when she rejected the opinion of
Honey's treating physician. *Id.* at 5, 11, 13.

## III. <u>Discussion</u>

### A. **Standard of Review**

Review of the Commissioner's decision denying a claimant's
application for social security disability benefits is limited to
determining whether the factual findings of the final decisionmaker are
supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g);
*Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008).

Substantial in this context is "more than a mere scintilla of evidence but may be less than a preponderance." *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988) (citation omitted). Put more pointedly, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In an adequately developed record, this can mean "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [an ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n.*, 383 U.S. 607, 620 (1966) (citations omitted).

Under this deferential standard, "[f]actual findings which are supported by substantial evidence must be upheld." *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012) (citations omitted); 42 U.S.C. § 405(g). This court's role is not to reweigh the evidence and make factual determinations, but to simply review the record and ensure that the ALJ provided "a discussion of the evidence and an explanation of reasoning for his conclusion sufficient to enable meaningful judicial review." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009)

16

(citations and quotations omitted). An ALJ meets that standard by stating "in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Comm'r of SSA*, 181 F.3d 429, 433 (3d Cir. 1999) (citations omitted). Moreover, when there is countervailing evidence, an ALJ must "give some reason for discounting the evidence she rejects." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (citation omitted); *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (holding that substantial evidence standard is unmet when ALJ fails to resolve conflicts created by countervailing evidence).

Here, ALJ Wolfe's factual findings were supported by substantial evidence in the record, and the reasoning underlying those conclusions was sufficient to enable judicial review.

## B.    The ALJ's Residual Functional Capacity Finding

Honey first contends that ALJ Wolfe did not provide an explanation for her alleged decision to exclude walking, sitting, and standing limitations from Honey's residual functional capacity, and that it violated the duty to conduct an adequate function-by-function assessment. Doc. 13 at 5–8. According to Honey, not only does this error

17

frustrate meaningful judicial review, but because the inclusion of such functional limitations may have impacted the vocational expert's testimony on Honey's employment prospects, it was not harmless. *Id.* at 9–11. A review of the record, however, finds that ALJ Wolfe explicitly included walking, sitting, and standing limitations in Honey's residual functional capacity, and conducted an adequate function-by-function assessment in compliance with the applicable regulations.

When crafting a claimant's residual functional capacity and assessing whether a claimant can perform their past work at step four of the sequential evaluation process, an ALJ must explain which level of work the claimant is currently capable of performing. 20 C.F.R. § 404.1520(a)(4)(i)–(iv); 20 C.F.R. § 404.1545(a)(5)(i)–(ii); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The Social Security regulations include a tiered series of work capacities, ranging from "sedentary work" to "very heavy work." 20 C.F.R. § 404.1567(a)–(e). Of relevance here, the regulations include a definition for "light work" that expressly addresses walking, sitting, and standing:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or

standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

In determining Honey's residual functional capacity, ALJ Wolfe concluded that she was limited to performing "light work as defined in 20 CFR 404.1567(b) except for the following limitations." Tr. 21. The ALJ then proceeded to list further limitations on Honey's ability to perform certain activities, including, among others, her ability to sit and stand. *Id.* at 22. As highlighted by the Commissioner, *see* Doc. 17 at 1–2, the ALJ explicitly provided that Honey "requires a sit/stand option with each interval up to 1/2 hour, but she is not off task while transferring." *Id.* Honey does not reference those limitations, claiming instead that ALJ Wolfe made neither any findings concerning her walking, sitting, and standing abilities, nor provided for any limitations regarding them. Doc. 13 at 6, 8, 10.

Yet, by the plain language of the ALJ's decision, she found that Honey's physical maladies limited her to performing "light work as

19

defined in 20 CFR 404.1567(b)[,]" Tr. 21, a category that by definition limits her to no more than "frequent lifting or carrying of objects weighing up to 10 pounds[,]" and a "good deal of walking or standing" during the work day. 20 C.F.R. § 404.1567(b). The social security regulations further instruct that " '[f]requent' means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *6. Thus, by limiting Honey to light work, ALJ Wolfe found that Honey was, at a minimum, limited to walking off and on for approximately 6 hours of the workday. *Id.*; 20 C.F.R. § 404.1567(b).

In addition to this conventional limitation, ALJ Wolfe also found that Honey's limitations in the areas of sitting and standing required she have a further "sit/stand option with each interval up to 1/2 hour, but she is not off task while transferring." Tr. 22. The Social Security regulations expressly provide for the incorporation of this type of limitation where "the medical facts lead to an assessment of RFC which [is] compatible with the performance of either sedentary or light work

except that the person must alternate periods of sitting and standing.
The individual may be able to sit for [a] time, but must then get up and
stand or walk for awhile before returning to sitting." SSR 83-12, 1983
WL 31253, at *4. Accordingly, the ALJ provided special limitations to
accommodate Honey's more limited ability to sit and stand, which were
more restrictive than the definition of "light work."

Honey relies on SSR 96-8p to support her assertion that ALJ
Wolfe's findings were in error. Doc. 13 at 7–8. Specifically, Honey
leverages the "Exertion Capacity" section of the ruling, which provides,
in pertinent part, that

> Each function must be considered separately (e.g., "the
> individual can walk for 5 out of 8 hours and stand for 6 out of
> 8 hours"), even if final RFC assessment will combine
> activities (e.g., "walk/stand, lift/carry, push/pull"). Although
> the regulations describing the exertional levels of work and
> the Dictionary of Occupational Titles and its related volumes
> pair some functions, it is not invariably the case that treating
> the activities together will result in the same decisional
> outcome as treating them separately.

SSR 96-8p, 61 Fed. Reg. 34474, 34477 (July 2, 1996).

Conducting a "function-by-function assessment" requires that an
ALJ "articulate how the evidence in the record supports the RFC
determination, discuss the claimant's ability to perform sustained work-

related activities, and explain the resolution of any inconsistencies in the record." *Brooks v. Saul*, 2019 WL 7048794, *7 (E.D. Pa. 2019) (quoting *Bencivengo v. Comm'r of Soc. Sec.*, 251 F.3d 153 (3d Cir. 2000)). This does not mean the ALJ must "make specific, written findings on dozens of individual work function categories." *Brooks*, 2019 WL at *7. Rather, it simply means the ALJ's "RFC determination must include an explanation of the substantial evidence upon which it relies." *Id.*

The limitation findings an ALJ makes during a residual functional capacity assessment are subject to the general duty of articulation standard set forth above. *See Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d Cir. 2001) ("[T]he ALJ's finding of residual functional capacity must 'be accompanied by a clear and satisfactory explication of the basis on which it rests.'") (quoting *Cotter v. Harris*, 642 F.2d 700 (3d Cir. 1981)). This means that well-articulated residual functional capacity assessments supported by substantial evidence are permitted to include, in the absence of or in addition to their individually tailored limitation findings, ones pulled from the regulation's tiered series of work capacities. *See Chiaradio v. Comm'r of Soc. Sec.*, 425 F. App'x 158,

161 (3d Cir. 2011) (affirming a residual functional capacity assessment with a "light work" functional limitation that did not engage in a "task by task analysis," but was well-articulated and supported "by substantial evidence on the record.").

That is precisely what ALJ Wolfe did here, enumerating a comprehensive discussion of the substantial evidence upon which her residual functional capacity determination relied. Her discussion included consideration of Honey's symptom allegations, her clinical records, her examination evaluations, her treatment records, and the available opinion evidence—in other words, it addressed all the pertinent evidence of record. Tr. 22–26. ALJ Wolfe explained that based on certain evidence, specifically treatment notes, history of treatment, pain, and some limitations in performing daily activities, Honey, in addition to standard light work limitations, required individualized work limitations in the areas of standing, sitting, climbing, balancing, stooping, kneeling, crouching, crawling, pushing, and pulling. *Id.* at 21–22, 24. Those additional limitations, coupled with the inherent limitations of the "light work" definition, were consistent with the evidence and physicians' opinions in the record that the ALJ deemed

persuasive. *Id.* at 25–26, 92, 111. The Court will refrain from reweighing those factual determinations. *Diaz*, 577 F.3d at 504.

ALJ Wolfe also found that because the record lacked sufficient evidence supporting Honey's allegations of pain after treatment, near total inability to perform daily functions, and trouble walking, no additional limitations beyond those already outlined were necessary. Tr. at 22–24. That well-articulated "explication of the basis on which" ALJ Wolfe's function-by-function assessment relied was substantially supported by the evidence of record (*see id.* at 92–97, 111–16, 266–79, 339, 349–411, 440, 730, 736, 884–97, 898–916, 977–78, 990–91, 1039, 1050, 1195–96, 1201, 1203), and does not give rise to any analytical error. *Fargnoli*, 247 F.3d at 41.

Honey further argues that the factually analogous matters of *Barbour v. Kijakazi*, 2021 WL 4478332 (M.D. Pa. 2021), and *Mattox v. Kijakazi*, 2023 WL 5943135 (M.D. Pa. 2023), militate in favor of remand here. Doc. 13 at 7–11. A review of those decisions—neither of which is binding precedent—finds that they are inapposite to those facts now before the Court.

24

In *Barbour*, the Court rejected an ALJ's residual functional capacity determination because "the inadequacies in the ALJ's function-by-function assessment, and evaluation of the medical opinion evidence" frustrated meaningful judicial review. 2021 WL 4478332, at *5. Specifically, the ALJ made no specific findings regarding the claimant's ability to stand and walk, despite lingering record inconsistencies concerning those functional capacities. *Id.* This, the Court found, was significant because it may have impacted the testimony elicited from the vocational expert. *Id.* at *6.

Likewise, in *Mattox*, the Court remanded a disability benefits denial because the ALJ's decision had inadvertently and materially mischaracterized a medical opinion on which it relied when fashioning the claimant's residual functional capacity limitations. 2023 WL 5943135, at *7. The Court found that not only did this error frustrate judicial review, but it was harmful because, similar to the facts in *Barbour*, it had a potential impact on the testimony delivered by the vocational expert. *Id.* at *8.

Unlike the circumstances in *Barbour* and *Mattox*, here, ALJ Wolfe accurately summarized the medical opinions she considered when

25

fashioning the claimant's residual functional capacity limitations in the areas of walking, standing, and sitting (*see* Tr. 25, 92–94, 111–13), and ALJ Wolfe made specific findings regarding the claimant's ability in those same three areas (*id.* at 21–22). Accordingly, because ALJ Wolfe's function-by-function assessment in her residual functional capacity determination was premised on substantial evidence and was sufficiently articulated to permit judicial review, it will be left undisturbed. *Fargnoli*, 247 F.3d at 41; *Chiaradio*, 425 F. App'x at 161.

## C.    The ALJ's Evaluation of the Medical Opinions of Dr. Charles Manganiello and Dr. Catherine Smith

Honey additionally contends that because ALJ Wolfe found the medical opinions of consultative examiners Dr. Charles Manganiello and Dr. Catherine Smith persuasive, it gave rise to a duty to explain any failure to include the sitting, standing, and walking limitations in those opinions when crafting Honey's residual functional capacity. Doc. 13 at 11–12; Doc. 18 at 5–7. As set forth above, that characterization is inconsistent with the limitations set forth in ALJ Wolfe's residual functional capacity determination.

An ALJ has no obligation to model a residual functional capacity assessment after any medical opinion, including those deemed

26

persuasive. *See Kertesz v. Crescent Hills Coal Co.*, 788 F.2d 158, 163 (3d Cir. 1986) ("The ALJ is not bound to accept the opinion or theory of any medical expert, but may weigh the medical evidence and draw its own inferences."). To enable meaningful judicial review at the residual functional capacity stage, an ALJ need not "use particular language or adhere to a particular format in conducting his analysis." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004). An ALJ must instead simply explain his or her findings and sufficiently develop the record. *Id.* To allow them the latitude to do this, an ALJ is given sole authority over "surveying the medical evidence to craft a[] [residual functional capacity]." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006). And as it relates to making findings, "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining a[] [residual functional capacity]." *Id.*

In her evaluation of the evidence, ALJ Wolfe assessed the opinions of Dr. Manganiello and Dr. Smith and found them persuasive, saying that "[i]n general, the doctor's opinions are consistent with, and supported by the longitudinal record." Tr. 25. Those findings specified that Honey was able to perform light work under 20 C.F.R.

§ 404.1567(b), with additional limitations in the areas of climbing, balancing, stooping, kneeling, crouching, and crawling. *Id.* at 92–97, 111–16. Both physicians opined that Honey would be limited to standing or walking for six hours out of an eight-hour workday. Tr. 92, 111.

As discussed *supra*, ALJ Wolfe's own residual functional capacity determination found Honey was limited to light work, the definition of which "requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday," SSR 83-10, 1983 WL 31251, at *6, and thus tracked Dr. Manganiello's and Dr. Smith's findings. Indeed, in the interest of crediting Honey's statements about the negative impact of her symptoms, ALJ Wolfe added additional limitations in the areas of sitting and standing, including that any job obtained include "a sit/stand option with each interval up to ½ hour." Tr. at 21–22, 24. Those additional limitations went above those suggested by Dr. Manganiello and Dr. Smith, thus placing this scenario beyond Honey's cited authority. *See* Doc. 13 at 12–13 (citing *Hines v. Colvin*, 2015 WL 8489970 (M.D. Pa. 2015)).

28

Coupled with ALJ Wolfe's otherwise comprehensive discussion of the substantial evidence upon which her residual functional capacity determination relied, *see supra* at 23–25, her deviation here from the limitation findings of Dr. Manganiello and Dr. Smith was wholly permissible, articulated, and even in Honey's favor. *Jones*, 364 F.3d at 505; *Titterington*, 174 F. App'x at 11. Because ALJ Wolfe's overarching approach to crafting a residual functional capacity was premised on substantial evidence and sufficiently articulated to permit judicial review, it will not be disturbed. *Jones*, 364 F.3d at 505; *Johnson*, 529 F.3d at 200.

## D.    The ALJ's Evaluation of the Medical Opinion of Dr. Joseph Patruno

Honey further contends that ALJ Wolfe erred in rejecting the medical opinion of Dr. Joseph Patruno, a treating physician. Doc. 13 at 13–16. But Honey's disagreement with the ALJ's assessment of Dr. Patruno's opinion does not warrant remand where, as here, that evaluation comported with all applicable regulatory requirements.

On November 13, 2020, Dr. Patruno completed a medical statement related to his treatment of Honey. Tr. 337–41. Of relevance, he opined that Honey could only sit for 10 minutes at a time, stand for

29

20 minutes at a time, that she could sit, stand, and walk for less than two hours total during an eight-hour workday, that she required a job that permitted her to shift from walking, sitting, and standing, that she needed several unscheduled breaks to lie down, and that she could lift and carry less than 10 pounds frequently, 10 pounds occasionally, and 20 pounds rarely. *Id.* at 338–40.

Under the current regulations, medical opinions are not entitled to any specific weighting, and are instead evaluated based on their persuasiveness. 20 C.F.R. §§ 404.1520c(a), 404.1520c(b). An ALJ determines the persuasiveness of a prior medical finding or medical opinion by assessing five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors. 20 C.F. R. § 404.1520c(a)–(c). The factors related to the substance of medical opinions–supportability and consistency–are the "most important factors" for consideration. 20 C.F.R. § 404.1520c(b)(2). Examining supportability entails a review of the opinion's basis in relevant "objective medical evidence and supporting explanations presented by a medical source"; consistency is assessed based on how consistent a finding or opinion is "with the evidence from other medical

sources and nonmedical sources in the claim[.]" 20 C.F.R.

§ 404.1520c(c)(1)–(2).

The Court of Appeals explained in *Cotter v. Harris* that when weighing the record, an ALJ "cannot reject evidence for no reason or the wrong reason" and must explain "why probative evidence has been rejected . . . so that a reviewing court can determine whether the reasons for rejection were improper." 642 F.2d 700, 706–07 (3d Cir. 1981). This does not mean, however, that the ALJ must undertake an exhaustive discussion of all of the evidence. *See, e.g., Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001); *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004) (non-precedential) ("There is no requirement that the ALJ discuss in her opinion every tidbit of evidence included in the record.").

Here, ALJ Wolfe found Dr. Patruno's opinion unpersuasive because it lacked significant support in and was inconsistent with the weight of the evidence. She explained that Dr. Patruno's severe limitation findings, which, as Honey admits, essentially limited her to sedentary work or less, Doc. 13 at 14, were neither fully supported by the record nor adequately tailored to Honey's condition. Tr. 26. Rather,

the ALJ found "that the record supports limiting the claimant to light work with a sit/stand option," and noted that "a limitation to sedentary would aggravate her condition," as she testified "that sitting aggravates her pain." *Id.*

ALJ Wolfe explained that a light work limitation was more consistent with the record because, while Honey had some physical deficits in areas like standing and sitting, she had "no sensory or strength deficits[,]" and she did "not use any assistive devices to ambulate." *Id.* In accordance with this determination, the ALJ found that the record did not support limitations beyond the sedentary level in Honey's residual functional capacity, including Dr. Patruno's recommendation that she have an option to lie down during the day, and observation that she was physically limited for weeks following pain injections. *Id.* That determination was bolstered by the evidence of record showing that Honey engaged in standard life activities, such as preparing meals, doing housework, and driving. *Id.*

That analysis readily met ALJ Wolfe's regulatory duty to consider the consistency and supportability of Dr. Patruno's opinion, in arriving at the conclusion that it did not merit persuasive weight. *See, e.g., Jones*

*v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991) (holding medical opinions that are inconsistent with and unsupported by the medical evidence are not persuasive or controlling); *Wright v. Sullivan*, 900 F.2d 675, 683 (3d Cir. 1990) (same). Furthermore, this Court's role is not to re-weigh the evidence to make its own factual determinations. *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011). As such, because ALJ Wolfe evaluated Dr. Patruno's opinion pursuant to her regulatory duty in finding it unpersuasive, that finding will not be disturbed.

## IV.    <u>Conclusion</u>

Accordingly, the Court will affirm the decision of the Commissioner and deny the Plaintiff's request for relief. A separate order shall be issued.

Date:  September 23, 2025       ***s/ Phillip J. Caraballo***
                                Phillip J. Caraballo
                                United States Magistrate Judge